UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Coalition to March on the RNC and
Stop the War,

         Plaintiff,

v.                                                                    Civil No. 08-835 (JNE/JJG)
                                                                      ORDER
The City of St. Paul, Minnesota; Mayor Chris
Coleman; St. Paul Police Chief John M.
Harrington; and Assistant St. Paul Police Chief
Matthew D. Bostrom,

         Defendants.

---

Robert Hennessey, Esq., Lindquist & Vennum PLLP; Todd Noteboom, Esq., and Timothy
Griffin, Esq., Leonard, Street and Deinard P.A.; Teresa Nelson, Esq., ACLU of Minnesota; and
Bruce Nestor, Esq., De Leon & Nestor, appeared for Plaintiff The Coalition to March on the
RNC and Stop the War.

John Kelly, Esq., James Jerskey, Esq., and Cheri Sisk, Esq., Assistant City Attorneys, Office of
the City Attorney, appeared for Defendants The City of St. Paul, Minnesota; Mayor Chris
Coleman; St. Paul Police Chief John M. Harrington; and Assistant St. Paul Police Chief Matthew
D. Bostrom.

---

On September 1, 2008, the Republican National Convention (RNC) begins in St. Paul,

Minnesota's capital.  That day, a march organized by The Coalition to March on the RNC and

Stop the War (Coalition) will take place.  As its name suggests, the Coalition is an association of

groups and individuals interested in parading within sight and sound of the Xcel Energy Center,

the site of the RNC, and expressing their opposition to the war in Iraq.  On May 14, 2008, the

City of St. Paul (City) issued an alternate permit to the Coalition; the permit differs from the one

sought by the Coalition with regard to the parade's route, start time, and end time.[1]  The

Coalition maintains that the permit is constitutionally infirm and now moves for a preliminary

injunction ordering the City, Mayor Chris Coleman, St. Paul Police Chief John Harrington, and

Assistant St. Paul Police Chief Matthew Bostrom (collectively, Defendants) to grant the

Coalition's amended permit application.  For the reasons set forth below, the Court denies the

Coalition's motion.

## I.   BACKGROUND

On September 1, 2008, the opening day of the RNC, the Coalition will conduct a rally at

the State Capitol and also a parade that starts and ends at the Capitol and that comes within sight

and sound of the Xcel Energy Center.  The Coalition has secured a permit for use of the

Capitol's South Stairs and Upper and Lower Malls (the large, pie-shaped park area in front of the

Capitol) from 8:00 a.m. to 8:00 p.m.  In its initial application, dated November 1, 2007, the

Coalition applied for a permit to march every other month from January to September 2008[2] on a

route that encircles the Xcel Energy Center:  from the Capitol on John Ireland Boulevard to

Kellogg Boulevard; left on Kellogg to Washington Street; left on Washington to 5th Street; left

on 5th to 7th Street; left on 7th to Kellogg; right on Kellogg to John Ireland; and right on John

Ireland to the Capitol.  The Coalition requested a start time of 11:00 a.m. and a finish time of

7:00 p.m.  It also estimated the number of participants to be from three people to 100,000 people.

By letter dated November 21, 2007, Assistant Chief Bostrom responded to the Coalition's

permit application.  With regard to the Coalition's application for a permit on September 1,

---

[1]      Under section 366A.09(a) of the City Code, "[t]he chief of police, in denying an application for a parade . . . permit, may authorize the conduct of the parade . . . at a date, time, location, or route different from that named by the applicant."

[2]      No claim arising out of the Coalition's marches from January to July is before the Court.

Assistant Chief Bostrom noted the need for the City and the police department to engage in extensive planning.  He anticipated most of the approximately 45,000 visitors to the RNC to travel to the Xcel Energy Center and its immediate surroundings via motorized vehicle or on foot.  As it happens, a significant portion of the City's commercial, medical, and cultural districts, as well as some of the City's most heavily traveled streets and points of freeway ingress and egress, are in the area surrounding the Xcel Energy Center.  Accordingly, Assistant Chief Bostrom asserted a compelling need for the City and the police department to engage in extensive planning to facilitate safe and orderly movement of vehicular and pedestrian traffic during the RNC.  In addition, Assistant Chief Bostrom noted that the RNC had been designated a "National Special Security Event," triggering a requirement that the United States Secret Service take special precautions and safety measures to secure the RNC's site and immediate surroundings.[3]  He asserted the need for the police department to confer with federal, state, and local law enforcement agencies to carry out its responsibilities for securing the area outside of the Xcel Energy Center.  In short, Assistant Chief Bostrom asserted a compelling need for the City and the police department to engage in extensive planning to assure the safety of all who work in, live in, or visit the City during the RNC.  As the City's and the police department's planning had not yet progressed to a point where Assistant Chief Bostrom could make required

---

[3]      The streets of St. Paul were probably not designed with an event like a National Special Security Event in mind.  Fair or not, St. Paul has a bipartisan, nay, tripartisan reputation for being difficult to navigate. (And why not?  Where else can you progress along 5th Street and find yourself at an intersection with 7th Street, which used to be 8th Street and becomes Fort Road?) In 1999, Governor Jesse Ventura, the nominee in 1998 of the Reform Party of Minnesota which is now known as the Independence Party of Minnesota, quipped on national television that inebriates must have designed St. Paul's streets.  St. Paul's mayor at the time, Norm Coleman, who is a Republican and now a United States Senator, took exception but acknowledged that "at times it's tough to get around."  In a poem written long before the governor's and the mayor's remarks, Garrison Keillor, an avowed Democrat, complimented the street system of Minneapolis in contrast to that of St. Paul where "there is no sense to it at all."  Bill McAuliffe & Kevin Duchschere, *Ventura's remarks . . . Not lost in St. Paul*, Star Tribune, February 25, 1999, at A1.

findings under the City Code, he stated that he could neither grant nor deny the Coalition's application as it related to the parade on September 1.

Over the next few months, the parties discussed the Coalition's permit application. Eventually, on February 29, 2008, the police department issued guidelines regarding the issuance of permits to conduct parades near the Xcel Energy Center and the surrounding area on September 1. The guidelines stated that the City's and the police department's planning had not yet progressed to a point to allow issuance of such permits and that permits would issue at the earliest opportunity that such planning activities allow and no later than May 31.

The day after the guidelines' issuance, the police department issued a "conditional alternative permit" to the Coalition. The conditional alternative permit authorized the Coalition to conduct a parade on September 1 but did not specify the parade's start time, end time, or route.

On March 6, 2008, the Coalition attempted to appeal the conditional alternative permit, and the City Council declined to consider the appeal as premature. The City explained that the City Code provides for an appeal to the City Council from the denial of a permit application, that the conditional alternative permit issued "at the insistent and repeated requests of the Coalition," and that the conditional alternative permit was not intended to serve as a permit under the Code but rather "a good faith statement of intent on the part of the Saint Paul Police Department . . . in recognition and accommodation of the Coalition's planning demands."

Also in early March, the Coalition amended its application with regard to its parade on September 1. The Coalition sought a "step off time" of 2:00 p.m. and an "unknown" finish time. It estimated the number of participants to be from 30,000 to 50,000 people. The route sought did not change.

Later in March, the Coalition brought this action and moved for a preliminary injunction. The motion was scheduled to be heard on May 16, 2008.  Two days before the motion hearing, the police department issued the permit to the Coalition.  On May 16, pursuant to the parties' stipulation, the Court declared the guidelines regarding issuance of parade permits for September 1 null and void, ordered Defendants to remove the guidelines from the City's website, and cancelled the motion hearing.

As noted above, the permit differs from the one sought by the Coalition with regard to the parade's route, start time, and end time.[4]  In general terms, the permit authorizes the following parade route:  from the Capitol on Cedar Street to 7th Street; right on 7th to Old 6th Street; right on Old Sixth to 5th Street; left on 5th to 7th; left on 7th to Cedar; and left on Cedar to the Capitol.  The permit's route reaches as close as 84 feet to one of the two main entrances to the Xcel Energy Center for credentialed attendees.  It also passes two of the three media work spaces.  Forty feet separate the permit's route from one of the media work spaces; sixty feet separate the route from the other media work space.  As to timing, the permit sets the parade's start time at noon and end time at 4:00 p.m.  The permit also requires the parade to be clear of 5th Street by 2:00 p.m.

A few days after the permit's issuance, the Coalition appealed the denial of its application to the City Council.  The City Council, after a public hearing, denied the appeal.  A few weeks later, the Coalition amended its complaint and moved again for a preliminary injunction that requires Defendants to grant its November 1 application, as amended.  In its reply memorandum, the Coalition maintained its argument for the route for which it had applied, but offered, in the

---

[4]     Solely to illustrate the route for which the Coalition applied and the permit's route, the Court reproduces on the next page a map from the Coalition's Memorandum of Law in Support of Second Motion for Preliminary Injunction.



alternative, a route that combines the route for which it applied and the route in the permit.  The

Coalition's combination route diverges from the one for which it applied at the intersection of

Kellogg and Washington.  Instead of turning left on Washington, the Coalition's combination

route continues on Kellogg to St. Peter Street, where it turns left on St. Peter and continues to 7th

Street.  There, the combination route turns left on 7th and follows the permit's route in the

opposite direction to the Capitol.

On July 8, 2008, the undersigned toured the various routes and the interior of the Xcel

Energy Center with the Coalition's and Defendants' counsel and representatives.  The next day,

the Court heard argument on the Coalition's motion.

## II.    DISCUSSION

The Coalition asserts claims under 42 U.S.C. § 1983 (2000) for alleged violations of its

rights under the First Amendment and Fourteenth Amendment.  Although it raises both claims in

support of its motion, the Coalition argues primarily in terms of the First Amendment.  Its

arguments related to procedural due process essentially restate those asserted in connection with

the First Amendment.  Accordingly, the Court analyzes the Coalition's motion under the First

Amendment.  *See Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1258 n.5

(10th Cir. 2004).

To determine whether to grant a motion for a preliminary injunction, a court considers:

(1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm absent the

injunction; (3) the balance between this harm and the harm experienced by other parties if the

injunction issues; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d

109, 113 (8th Cir. 1981) (en banc).  Under the circumstances of this case, the first factor places

the burden on the Coalition to demonstrate that it is likely to prevail on the merits.  *See Planned*

*Parenthood Minn., N.D., S.D. v. Rounds*, No. 05-3093, 2008 WL 2550722, at *6-7 & n.6 (8th

Cir. June 27, 2008) (en banc); *United for Peace & Justice v. City of New York*, 323 F.3d 175, 178

(2d Cir. 2003) (per curiam); *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam).

The prohibition against "abridging the freedom of speech" in the First Amendment "applies not only to verbal expression, but also to symbolic or expressive conduct that is 'sufficiently imbued with elements of communication.'" *Robb v. Hungerbeeler*, 370 F.3d 735, 744 (8th Cir. 2004) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). As "public dramas of social relations," parades are generally expressive and fall well within the protections of the First Amendment. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 568-69 (1995). "'Since *all* speech inherently involves choices of what to say and what to leave unsaid,' one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" *Id.* at 573 (quoting *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11, 16 (1986)). Consistent with these principles, the Coalition obtained a permit that allows the Coalition to communicate its message, to the exclusion of all others, by marching through the streets of downtown St. Paul. Although the permit assures that the Coalition's parade will pass within sight and sound of the convention site, the Coalition objects to both the permit's route and timing requirements.

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983). In "quintessential public forums," such as streets "which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions,'" the government cannot prohibit all communicative activity. *Id.* (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). Nevertheless, the government may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open

ample alternative channels of communication." *Id.*; *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Phelps-Roper v. Nixon*, 509 F.3d 480, 486 (8th Cir. 2007); *Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006). Thus, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Indeed, the Supreme Court has "emphatically reject[ed] the notion . . . that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech." *Cox v. Louisiana*, 379 U.S. 536, 555 (1965).

Before considering whether the permit issued to the Coalition runs afoul of the constitutional restrictions placed on time-place-manner regulation of protected speech, the Court notes that the Democratic and Republican parties' quadrennial conventions have proven to be fertile ground in the recent past for legal challenges based on the First Amendment. *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8 (1st Cir. 2004) (2004 Democratic National Convention); *Poor People's Econ. Human Rights Campaign v. City of St. Paul*, Civ. No. 08-2427 (D. Minn. filed June 17, 2008) (2008 Republican National Convention); *ACLU of Colo. v. City of Denver*, Civ. No. 08-910 (D. Colo. filed May 1, 2008) (2008 Democratic National Convention); *Nat'l Council of Arab Ams. v. City of New York*, 331 F. Supp. 2d 258 (S.D.N.Y. 2004) (2004 Republican National Convention); *Coal. to Protest the Democratic Nat'l Convention v. City of Boston*, 327 F. Supp. 2d 61 (D. Mass. 2004), *aff'd sub nom. Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8 (1st Cir. 2004); *Stauber v. City of New York*, Civ. No. 03-9162, 2004 WL 1593870 (S.D.N.Y. July 19, 2004) (2004 Republican National Convention); *Serv. Employee Int'l Union v.*

*City of Los Angeles*, 114 F. Supp. 2d 966 (C.D. Cal. 2000) (2000 Democratic National Convention).

Compared to the access afforded marchers to the sites of the recent national conventions of the Democratic and Republican parties, the Coalition appears to have unprecedented access to the convention site.  For instance, before the 2004 Democratic National Convention, political activists moved for a preliminary injunction to permit them to conduct parades on the public street that abuts that convention's site on each day of the convention.  *Coal. to Protest the Democratic Nat'l Convention*, 327 F. Supp. 2d at 64.  Denying the motion, the district court declined to alter the permitted route, which allowed parades on a street, characterized as "attenuated" from the convention's site, one "long block" away from the street on which the activists wanted to march.  *Id.* at 72-73.  With regard to the other Republican and Democratic national conventions in 2000 and 2004, the Court is not aware of any march that passed within sight and sound of the conventions' sites.  Instead, the marches terminated at rally sites that were much farther from the conventions' sites than the mere 84 feet that separate the closest point of the permit's route from one of the entrances to the Xcel Energy Center.  *Cf. United for Peace & Justice*, 323 F.3d at 177 (agreeing with district court's conclusion that city's decision to ban a march but permit a stationary rally was narrowly tailored to address assessed risks of march).

Nevertheless, the greater access afforded to the Coalition relative to marchers at other recent political conventions is not dispositive of the issues presented here.  Time-place-manner restrictions that may be constitutionally permissible at one site and event may be held constitutionally infirm at another site and event.[5]  *Cf. Hill v. Colorado*, 530 U.S. 703, 728 (2000)

---

[5]     Conversely, that speech occurs under a content-neutral regulation at a certain time or in a particular place or manner does not mean that it is constitutionally mandated.  *See Hill v. Colorado*, 530 U.S. 703, 726 (2000) ("As we have emphasized on more than one occasion, when

(noting necessity of accounting for the place to which regulations are applied in determining whether they are narrowly tailored); *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (stating that judicial review of time-place-manner restrictions is "highly context-sensitive").  Security measures that were used—and upheld—for one large gathering do not thereby become the baseline for all future large gatherings.  Were it otherwise, a sort of "security creep" would come, by increments, to overwhelm the First Amendment. Bearing in mind the necessity of a fact-specific inquiry as well as the substantial body of case law that has developed with regard to the questions at hand, the Court turns to the parties' arguments regarding whether Defendants violated the First Amendment by issuing the permit instead of granting the Coalition's application.

## A.     Content neutral

Although the Coalition acknowledges that the City Code is facially content neutral insofar as it applies to permits for parades, races, and public assemblies, the Coalition contends that Defendants did not apply the Code in a content-neutral manner in denying the Coalition's application and issuing the permit instead.  "[G]overnment regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated speech."  *Hill*, 530 U.S. at 720; *see Ward*, 491 U.S. at 791.  In *Ward*, the Supreme Court elaborated:

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.  The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed

---

a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal."); *United States v. Albertini*, 472 U.S. 675, 689 (1985) ("The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.").

neutral, even if it has an incidental effect on some speakers or messages but not others.  Government regulation of expressive activity is content neutral so long as it is "*justified* without reference to the content of the regulated speech."

491 U.S. at 791 (citations omitted) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S.

288, 293 (1984) (emphasis added)).

The Coalition first argues that Defendants' delay in acting on its application belies

Defendants' assertion that their decision was content neutral.  The Coalition maintains that its

permit should have issued long ago such that the convention would have to have been planned

around its parade.  The Court does not find the Coalition's argument persuasive.  In connection

with protests at the 2002 Winter Olympics in Salt Lake City, the Tenth Circuit rejected an

argument similar to the one made here by the Coalition:

> It may be convenient for applicants to have nearly a year to "orchestrate their protests and demonstrations," but they have no constitutional right to demand that city officials make decisions affecting countless other people so long before interrelated decisions have been made.  It was reasonable for the City to work out arrangements for the location and timing of Olympic venues, along with attendant security and public health and safety concerns, and then to turn its attention to applications for demonstration permits.  The City acted on [an advocacy organization's] permit roughly two and a half months before the Olympics began. We consider that more than adequate, under the circumstances, to satisfy the demands of the First Amendment.

*Utah Animal Rights Coal.*, 371 F.3d at 1261.  Regardless of what time limits may be contained in

a local ordinance, there is no constitutional requirement of a fixed deadline by which the

government must act under a content-neutral permit scheme.  *See Covenant Media of S.C., LLC*

*v. City of N. Charleston*, 493 F.3d 421, 435 (4th Cir. 2007), *cert. denied*, 128 S. Ct. 914 (2008);

*S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1137-38 (9th Cir. 2004); *Utah Animal*

*Rights Coal.*, 371 F.3d at 1260; *Granite State Outdoor Adver., Inc. v. City of St. Petersburg*, 348

F.3d 1278, 1282-83 (11th Cir. 2003).  There is no evidence that Defendants disfavored or sought

to stifle the Coalition's message by acting on its application approximately 3.5 months before its

planned march.

     The Coalition also argues that Defendants did not act in a content-neutral manner because

they failed to provide specific reasons for their denial of its application.  Again, the Court

disagrees.  In a letter dated May 14, 2008, from the City to the Coalition, Defendants explained

the reasons that the route in the permit differed from the one requested:

> Section 366A.08 [of the City Code] requires that the [police department] explain
> to you why certain portions of the route and the start time cannot be granted
> exactly as requested in the Coalition's permit application.  For the reasons set
> forth below, this decision is narrowly-tailored to promote the [police
> department's] significant interest in ensuring public safety and order, and the safe
> and orderly movement of pedestrian and vehicular traffic in the area particularly
> as it relates to Kellogg Boulevard, and certain portions of 5th and 7th Streets.

>     A few of the many compelling reasons considered by the [police
> department] in reaching this decision, was the need to:  (1) minimize the effect the
> possible detonation of explosive devices can have on the Xcel Energy Center; (2)
> reflect the geography of the area surrounding the Xcel Energy Center and the
> amount of space necessary to secure the site, including the space necessary to
> conduct effective and orderly magnetometer searches of each credentialed
> attendee and vehicle, to evacuate the facility in case of emergency and to ensure
> access by emergency vehicles; and (3) enable the safe and orderly, multiple-
> times- per-day movement of approximately 45,000 credentialed persons on as
> many as 300 delegate busses and hundreds of automobiles.  Consequently, after
> considering the best information presently known to it, the [police department]
> finds pursuant to Section 366A.06 [of the City Code], that a parade conducted on
> certain portions of the exact route and at the exact start time named in the permit
> application:

>     1.    Will substantially interrupt the safe and orderly movement of other
> pedestrian or vehicular traffic contiguous to its route or location; and

>     2.    Will require the diversion of so great a number of city police
> officers to properly police the line of movement and the areas contiguous
> thereto that the deployment of police services for the proposed parade
> would have an immediate an[d] adverse effect upon the welfare and safety
> of persons and property; and

>     3.    Will, by the concentration of vehicle and persons at public
> assembly points of the parade, unduly interfere with proper fire and police
> protection of, or ambulance service to, areas contiguous to such parade.

Since it submitted its application, the Coalition received repeated assurances from Defendants that it would receive a permit to march on September 1 within sight and sound of the Xcel Energy Center.  There is no evidence that Defendants' denial of the Coalition's application and issuance of the permit were anything but content neutral.

**B.      Narrowly tailored to serve significant government interest**

The Coalition next asserts that Defendants' denial of its application was not narrowly tailored to serve a significant government interest.  A narrowly tailored time, place, or manner regulation of speech need not be the least restrictive means available to serve the government's interest:

> [W]e reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.  Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.  So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.  "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted.

*Ward*, 491 U.S. at 798-800 (footnotes and citations omitted) (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)); *see Hill*, 530 U.S. at 726 ("As we have emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal."); *Phelps-Roper*, 509 F.3d at 487 ("For a statute to be narrowly tailored, it must not burden substantially more speech than necessary to

further the state's legitimate interests."); *Bowman*, 444 F.3d at 980 ("A regulation is narrowly tailored when it furthers a significant government interest that would be achieved less effectively without the regulation.  The statute does not, however, need to be the least restrictive means of regulation possible." (citation omitted)).

The Court begins by noting that the place subject to Defendants' regulation is the site of the quadrennial convention of one of the nation's major political parties.  *See Hill*, 530 U.S. at 728.  Likely attendees include the President, the Vice President, members of the Cabinet, the party's nominees for the offices of President and Vice President, members of Congress, governors, and other government officials.  Tens of thousands of people will attend the convention.  The concentration of high-ranking government officials and a substantial number of people presents daunting security challenges.  Threats to the convention that the Secret Service must consider include terrorist attacks, lone gunmen, fire, chemical or biological attacks, detonation of explosive devices, and suicide bombers.  In addition, many groups have endorsed a call to shut down the RNC by blockading the convention site, immobilizing delegates' transportation, and blocking bridges that connect St. Paul and Minneapolis.  Defendants plainly have a substantial interest in securing the area immediately surrounding the convention site.

Notwithstanding this substantial government interest, the Coalition seeks to encircle the arena, marching on every route that directly abuts the convention site.  Defendants' denial of the Coalition's application directly served the substantial government interest in securing the convention site.  *See Cox*, 379 U.S. at 554-55 ("Governmental authorities have the duty and responsibility to keep their streets open and available for movement.  A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."); *Citizens for Peace in*

*Space v. City of Colo. Springs*, 477 F.3d 1212, 1223 (10th Cir. 2007) ("Here, the security zone directly advanced the City's interest in keeping explosives away from the NATO conference because it limited access near the [conference site] to identified and screened individuals who were less likely to pose any threat to the delegates."); *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 858 n.9 (9th Cir. 2004) (acknowledging government's significant interests in controlling traffic flow at a performance venue and in protecting government officials); *Bl(a)ck Tea Soc'y*, 378 F.3d at 12 ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *Weinberg v. City of Chicago*, 310 F.3d 1029, 1038 (7th Cir. 2002) ("There is no doubt the City has a legitimate interest in protecting its citizens and ensuring that its streets and sidewalks are safe for everyone.  Its interest in maintaining the flow of pedestrian traffic is intertwined with the concern for public safety." (citation omitted)); *Nat'l Council of Arab Ams.*, 331 F. Supp. 2d at 272 ("[T]his Court cannot blind itself to the daunting security concerns facing [New York City] during the [2004] Republican National Convention."); *Coal. to Protest the Democratic Nat'l Convention*, 327 F. Supp. 2d at 77 ("[I]t may be anticipated, at this and similar national security events, that some significant portion of the demonstrators, among those who want the closest proximity to delegates or participants, consider assault, even battery, part of the arsenal of expression.  And as a consequence, those responsible for event safety must plan for violence."); *Serv. Employee Int'l Union*, 114 F. Supp. 2d at 971 (acknowledging that "a narrowly tailored no activity zone is constitutionally permissible in order to ensure that delegates can enter and exit the [site of the 2000 Democratic National Convention] safely").  By preventing encirclement of the convention site, the denial of the Coalition's application minimizes the potential for a blockade.[6]  It preserves a secured zone around the

---

[6]       Although Defendants do not ascribe to the Coalition the motives of those groups that seek

convention site that mitigates the threat posed by a variety of weapons, that provides a secure

space in case an evacuation of the arena is necessary, that provides for the delegates' safe and

orderly arrival at and entrance into the arena, and that allows emergency vehicles to access the

arena.[7]

To preserve the Coalition's desire to parade on John Ireland and Kellogg, the Court

considered the feasibility of a combination of the route for which the Coalition applied and the

permit's route.  The portion of John Ireland for which the Coalition applied is a grand avenue,

framed by two of the capital's most majestic buildings:  the Capitol, designed by Cass Gilbert,

and the Cathedral of St. Paul.  At Kellogg, the route for which the Coalition applied turns left

and, with St. Paul's skyline in view, descends to the very front of the Xcel Energy Center.

The Court has pondered a way for the parade to proceed from some portion of that route

over to the area of 5th, Old 6th, and 7th Streets, then to 7th and Cedar, and then back to the

Capitol.  If it were possible, the parade's route would approximate a diamond, avoiding the turn-

around that the Coalition finds logistically objectionable.[8]  The arena lies, though, near

to shut down the RNC by blockading the convention site, the Coalition acknowledged at the
motion hearing that the number of participants in its march prevents it from guaranteeing that
participants will not engage in "peaceful resistance" by, for example, sitting in the middle of the
street.

[7]      Although the combined route proffered in the Coalition's reply memorandum does not
directly encircle the convention site, it marches along an entire side of the arena and occupies
routes necessary for the secured transportation system, in effect encircling an area that includes
not only the Xcel Energy Center but private businesses as well.

[8]      A traffic engineer retained by the Coalition submitted an affidavit in which he identified
the intersection of 7th and Cedar—not the triangular turn-around—as "the critical location for
pedestrian flow capacity."  As more fully described in footnote 9, *infra*, the parties appear to
have resolved this potential bottleneck by agreeing to a slight alteration of the permit's route.
The Court notes that the Coalition retained the permit's triangular turn-around, which it
characterized as a "dead-end[]" in its memorandum of law, in its combination route and that the
permit's triangular turn-around maximizes the Coalition's time within sight and sound of the

Interstates 94 and 35E, and this location compresses the available space and contributes to the practical impediments to a parade route that would connect a John Ireland-based route with a Cedar-based route.  Some discussion of the impediments follows.

Before arriving at the arena, Kellogg passes over Interstate 35E and leaves but two routes that directly connect to the permit's route.  One directly abuts the arena's glass front; it cannot be used due to the security concerns detailed above.  The other leads to the intersection of Smith Avenue, 5th Street, Main Street, and Old 6th Street, where, to the northwest, 5th serves as an extension of the on- and off-ramps of Interstate 94.  (To the southeast of 7th, 5th is a one-way eastbound street; to the northwest of 7th, 5th contains lanes flowing northwest that primarily serve as on-ramps to Interstate 94 and lanes flowing southeast that essentially serve as extensions of the off-ramp; Old 6th is a one-way street that also essentially serves as an on-ramp to Interstate 94.)  Accordingly, a route that combines the route for which the Coalition applied and the permit's route without passing directly by the arena severely restricts, if it does not entirely eliminate, access for delegates, emergency vehicles, and the general public from, or to, both interstates in the area of the arena.  To come within sight and sound of the convention site, the Coalition cannot use the route for which it applied without substantially compromising significant government interests.  Even if such a route were physically possible, the Court is obligated to consider the impact on public resources, traffic flow, and security.  *See Million Youth March, Inc. v. Safir*, 155 F.3d 124, 126 (2d Cir. 1998) ("[W]hen a federal district court crafts an injunction to vindicate a plaintiff's protected rights, it cannot simply order whatever a City is physically capable of doing, without regard to considerations of public health, safety, convenience, and cost."); *Nat'l Council of Arab Ams.*, 331 F. Supp. 2d at 272 ("[E]ven if this

---

Xcel Energy Center.  Defendants did not direct the Coalition to return to the Capitol on a route that leads away from the arena on, for example, Main Street.

Court were to require Defendants to issue the permit, Plaintiffs would not be entitled to hold the demonstration exactly as sought, since this Court cannot blind itself to the daunting security concerns facing this City during the Republican National Convention.").

Turning to the parade's timing, the Court notes that the Coalition's requests have varied significantly.  In its initial application, it sought a permit to march from 11:00 a.m. to 7:00 p.m.  In its amended application, it sought a permit to march starting at 2:00 p.m. and ending at an unknown time.  Based on the number of participants estimated in the Coalition's application, 30,000 to 50,000 marchers, Defendants issued the permit, which requires the Coalition's march to begin at noon, clear 5th Street by 2:00 p.m. and end at the Capitol by 4:00 p.m.  At its appeal before the City Council, it requested four hours to conduct its parade.  In support of its motion, the Coalition asserted that the time permitted for its march is insufficient as it expects from 50,000 to 100,000 participants, and, at the motion hearing, the Coalition represented that it needed five hours to complete its march.  In response, Defendants stated their willingness to slightly alter the route of the march to eliminate a potential bottleneck identified by the Coalition at Cedar and 7th.[9]  Defendants also expressed their willingness to permit the Coalition's march to begin at 11:00 a.m., clear 5th by 3:00 p.m., and end at the Capitol by 4:00 p.m.

According to Defendants, the Coalition needs to clear 5th Street by 2:00 p.m. (or 3:00 p.m.) so that emergency vehicles have unimpeded access to Interstate 94 while the convention is in session.  As already noted, the portion of 5th on which the Coalition marches under the permit connects to on- and off-ramps to Interstate 94.  The Coalition maintains that this restriction is not narrowly tailored because some lanes of 5th will be open no matter when the Coalition marches

---

[9]     Instead of proceeding from the Capitol to 7th entirely on Cedar, the march would proceed from the Capitol on Cedar to 10th Street, turn right, proceed on 10th to Wabasha Street, turn left, proceed on Wabasha to 7th, turn right, and follow the remainder of the permit's route.  At the motion hearing, the parties appeared to agree to this alteration.

and Defendants committed to allow the march to proceed even if there is a session in the morning or early afternoon. The Court disagrees.

Defendants are not tasked with planning the convention; they do not know what hours the convention will be in session. Rather, they are responsible for providing security around the Xcel Energy Center. That Defendants are willing to accommodate the Coalition's parade on 5th if there is a morning or early afternoon session of the convention does not eliminate the substantial government interest in access to and from one of the two interstates in the area for emergency vehicles. *See Kuba*, 387 F.3d at 858 n.9; *Coal. to Protest the Democratic Nat'l Convention*, 327 F. Supp. 2d at 70-71. Nor does Defendants' apparent ability to accommodate the Coalition's march on part of 5th Street during a morning or early afternoon session of the convention dictate that Defendants must do the same in the evening when, according to press reports mentioned by the parties at the motion hearing, the President will appear at the convention. *See Ward*, 491 U.S. at 798-800; *Cox*, 379 U.S. at 554; *Browning*, 522 F.3d at 1161; *Nationalist Movement v. City of Cumming*, 92 F.3d 1135, 1139-40 (11th Cir. 1996).

On this record, Defendants' denial of the Coalition's application and issuance of the permit constitute a narrowly tailored restriction that serves significant government interests.

## C.   Ample alternatives

Finally, the Coalition contends that the permit as issued does not leave open ample alternatives for communication of the Coalition's message. "The ample alternative channels analysis cannot be conducted in an objective vacuum, but instead it must give 'practical recognition' to the facts giving rise to the restriction on speech." *Citizens for Peace in Space*, 477 F.3d at 1226.

Here, despite massive security and logistical concerns inherent to the convention, the permit's route brings the Coalition within sight and sound of the convention site. The permit's route covers approximately 1,000 feet on Old 6th, 5th, and 7th between 5th and 6th. A substantial portion of that part of the route is in plain sight of the glass-walled front of the Xcel Energy Center. Even if security measures obscure the view of some portion of that part of the parade route from the convention site at street level, most, if not all, of the 1,000 feet is visible from the upper concourses of the arena. In addition to substantial visibility to the convention site, the permit provides unprecedented proximity to the convention site. At its closest point, the permit's route passes within approximately 84 feet of one of the primary entrances to the arena.

Moreover, the permit's route passes by two of the three primary media work spaces established for the convention. In *Bl(a)ck Tea Society*, the First Circuit recognized that the media may afford ample alternatives to firsthand expression at high-profile events:

> At a high-profile event, such as the [2004 Democratic National] Convention, messages expressed beyond the first-hand sight and sound of the delegates nonetheless have a propensity to reach the delegates through television, radio, the press, the internet, and other outlets. On this record, then, we cannot say that the district court erred in concluding that viable alternative means existed to enable protesters to communicate their messages to the delegates.

378 F.3d at 14; *cf. Citizens for Peace in Space*, 477 F.3d at 1226. Approximately 15,000 members of the media are expected to come to St. Paul to cover the 2008 RNC, and the Coalition's parade will pass within 40 and 60 feet, respectively, of two of the three primary spaces established for local, national, and international media outlets.

In addition to the Coalition's ability to communicate its message through its parade and the media, the Coalition may use a public viewing area that Defendants will establish. At the motion hearing, Defendants described the area as encompassing approximately four acres. A substantial portion of the area will be within sight and sound of the convention site. The public

viewing area is also adjacent to two of the three spaces set up for local, national, and international media. The public viewing area will be open from 7:00 a.m. to 11:00 p.m. on each day of the convention. The City expects to place a stage with audio equipment in the public viewing area and to make the stage available for one-hour periods on a lottery basis. Throughout the convention, the Coalition is free to seek access to the public viewing area and the stage to communicate its message.

The Court notes that the public viewing area described by Defendants appears to compare favorably to those employed during recent political conventions. For example, at the 2004 Democratic National Convention in Boston, a designated protest zone occupied approximately 27,000 square feet, largely under unused rail tracks. *Coal. to Protest the Democratic Nat'l Convention*, 327 F. Supp. 2d at 67. Two rows of concrete barriers, on which chain-link fence stood, surrounded the zone. *Id.* To prevent liquids and objects from being thrown at delegates, a tightly-woven mesh fabric that limited visibility covered the outer fence, and a looser mesh netting hung above. *Id.* Razor wire, not unique to the zone, ran along the rail tracks. *Id.* Despite characterizing the designated protest zone as "an offense to the spirit of the First Amendment" and "a grim, mean, and oppressive space" that gave the impression of an "internment camp," the district court declined to alter the zone as there was no injunctive relief available, given the constraints present at that location and the police department's safety concerns, that could vindicate the plaintiffs' First Amendment rights without causing significant harm to the public interest. *Id.* at 67, 74-76. Given the constraints under which the district court labored, the court of appeals affirmed. *Bl(a)ck Tea Soc'y*, 378 F.3d at 15.

At the 2000 Democratic National Convention, security planners established a small protest zone 260 yards from the entrance to the convention site. *Serv. Employee Int'l Union*, 114

F. Supp. 2d at 968.  Granting the plaintiffs' motion for a preliminary injunction, the district court enjoined the defendants from enforcing the security zone and ordered them to reconfigure the zone.  *Id.* at 975.  Less than two weeks later, the district court ordered pursuant to the parties' stipulation that the protest zone occupy approximately 72,000 square feet of a lot across the street from the convention site, though the lot appears to have been substantially farther from the convention site than the public viewing area proposed by Defendants here.[10]

Finally, the Coalition is not limited to the area immediately surrounding the Xcel Energy Center to communicate its message.  Subject to time-place-manner regulations, the Coalition is free to use public spaces throughout the Twin Cities to communicate its message.  *See Bl(a)ck Tea Soc'y*, 378 F.3d at 14 ("The district court perspicaciously noted that many other opportunities for demonstrations existed in the vicinity of the Fleet Center and throughout Boston.")  Indeed, the Coalition will conduct an all-day rally in one of the most prominent public spaces in the state, the South Stairs and the Upper and Lower Malls of the State Capitol, on the convention's opening day.  The Coalition's all-day rally, less than two miles from the convention site, will undoubtedly be the subject of extensive media coverage.

On this record, the permit leaves open ample alternatives for the Coalition to communicate its message.  Indeed, at the motion hearing, the Coalition appeared to concede that the permit's route has at least some merit.  The Coalition represented that many of its objections to the permit's route "fall by the wayside" so long as delegates enter the arena through the entrance closest to the permit's route.  The Coalition continued, "In other words, we have, we

---

[10]     According to *Coalition to Protest the Democratic National Convention*, after the reconfiguration of the secured area and demonstration zone at the 2000 Democratic National Convention in Los Angeles, protesters used slingshots to launch numerous projectiles over security fences at delegates, the arena, and law enforcement officers.  327 F. Supp. 2d at 73. Police responded with rubber bullets to disperse the crowd.  *Id.*

have very few objections to the route as long as we know that the delegates actually will be coming in as described." This last sentence refers to a description given during the site tour of how Defendants envision delegates entering the arena. The Coalition asked that the Court make the description part of its order to assure that a substantial number of delegates will use the entrance closest to the permit's route. The Court declines to order that private individuals arrive at a certain time and use a specific door, but notes as a practical matter that delegates will have little choice but to use the entrance closest to the permit's route in substantial numbers as that entrance is one of the two primary entrances into the arena.

The Coalition also claims that the permit's required start time does not leave open ample alternatives for communication. At the motion hearing, it asserted that the parade's start time "needs to be moved to a later point in the day to allow first and foremost for members of the Coalition to arrive from out of town." Major thoroughfares in the state's capital will close for several hours in the late morning and afternoon for the Coalition's parade. Those traveling from afar will have to plan accordingly to timely arrive, and might not be at the head of the parade. A parade that lasts several hours and starts a few hours earlier than requested affords ample alternatives for the Coalition to communicate its message. *See Nationalist Movement*, 92 F.3d at 1140. Although the Court can imagine unconstitutional time limitations placed on parades, none of the time requirements that have been discussed in connection with the Coalition's parade appears constitutionally infirm.

Given the Coalition's focus on the Xcel Energy Center's points of ingress and egress, it appears that the Coalition seeks a later start time to maximize the chances of directly confronting delegates as they enter the arena for the convention's likely evening session. The Coalition, however, has no constitutional right to physical access to the delegates. *See Citizens for Peace in*

*Space*, 477 F.3d at 1225 ("The Citizens also argue that they were denied ample alternative channels of communication because they were unable to interact with their intended audience; namely the conference delegates and international media. We conclude, however, that the Citizens were sufficiently able to communicate their message even though they had no close, physical interaction with their intended audience."); *Bl(a)ck Tea Soc'y*, 378 F.3d at 14 ("[A]lthough the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access."); *Coal. to Protest the Democratic Nat'l Convention*, 327 F. Supp. 2d at 71 ("The presence of delegates, media, people who work in or use the Bulfinch Triangle for non-DNC purposes, and curious onlookers, combined with the heightened risk of problems arising from the fact that the convention itself will actually be in progress, will essentially stress the public safety system to its limit. Adding a parade that obstructs the Causeway Street sidewalk, even a small one, could easily overburden the system."); *Serv. Employee Int'l Union*, 114 F. Supp. 2d at 971 (acknowledging that "a narrowly tailored no activity zone is constitutionally permissible in order to ensure that delegates can enter and exit the [site of the 2000 Democratic National Convention] safely").

Any delegate who is already in the arena will be able to see the parade—the front of the Xcel Energy Center is, as already noted, entirely glass along 7th Street.[11] Moreover, the Coalition, like the appellants in *Bl(a)ck Tea Society*, appears to have "greatly underestimate[d] the nature of modern communications." 378 F.3d at 14. In other contexts, it has been noted that

---

[11]     Given the Coalition's requests for a route along Kellogg, it is worth noting that the Xcel Energy Center itself (as opposed to the adjoining RiverCentre) presents, for the most part, a windowless brick facade along Kellogg.

there is symbolic value in marching before a site "even if no one is home." *Coal. to Protest the Democratic Nat'l Convention*, 327 F. Supp. 2d at 72 (noting that protesters often picket the White House when the President is out of town). Here, the Coalition's parade will take place on the opening day of the RNC, on the very afternoon of a day when the President of the United States might attend the convention. Accordingly, the precise time of the march—especially the time frames that have been discussed—will not materially affect the Coalition's ability to communicate its message via the parade. As discussed above, there is no obligation on the part of the St. Paul Police Department or the other defendants to maximize the opportunities for physical confrontation with conventioneers as they enter or leave the arena.

In short, on the present record, the Court concludes that Defendants' denial of the Coalition's application and issuance of the permit were content neutral, were narrowly tailored to serve significant government interests, and left open ample alternatives for communication of the Coalition's message. The Coalition has not demonstrated that it is likely to succeed on the merits of its First Amendment claim. The Court therefore denies the Coalition's motion. *See Planned Parenthood*, 2008 WL 2550722, at *10 & n.11.

### III.    CONCLUSION

In closing, the Court commends the parties for what appears to date to have been extraordinary efforts to communicate and reach accommodations satisfactory to both sides. The Court hopes these efforts continue, as they serve the interest of all parties in a peaceful march by the Coalition. To that end, the Court expects the parties to work together to ascertain with greater precision the number of participants expected in the Coalition's parade and to modify the permit's timing requirements according to Defendants' representations at the motion hearing, if

appropriate.  *Cf. United for Peace & Justice v. City of New York*, 243 F. Supp. 2d 19, 27-29

(S.D.N.Y.), *aff'd*, 323 F.3d 175 (2d Cir. 2003) (per curiam).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.      The Coalition's Second Motion for Preliminary Injunction [Docket No.
        50] is DENIED.

Dated:  July 16, 2008

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge
